KITCHENS, Justice,
dissenting:
¶ 48. Having concluded that the guilty verdict on Count II of the indictment was contrary to the overwhelming weight of the evidence, I would reverse Sanders’s conviction and remand for a new trial. It is abundantly clear from the record, and indeed, from the majority’s recitation of relevant portions of the well-documented medical history of Keir D. Sanders, that the accused in this sordid tragedy, from his early childhood, was plagued by serious mental illness for most of his life. Notwithstanding the occasional interruption of Sanders’s bizarre thinking and aberrant behavior by brief periods of relative lucidity and rational conduct, the jury’s verdict of not guilty by reason of insanity on Count I was amply supported by a great body of credible evidence, which in this case was the very same evidence upon which the jury reached a polar-opposite verdict on Count II. Because absolutely no proof was adduced to support a conclusion that Sanders’s mental condition was any different when he shot his grandmother than it had been a few moments earlier when he had shot and bludgeoned his grandfather, the jury’s guilty verdict on Count II was against the overwhelming *512 weight of the evidence. Therefore, I fully join Presiding Justice Dickinson’s dissent, but write separately to explain more fully my reasons for dissenting.[44]
¶ 49. Prior to 1985, a multi-count indictment would not have been permitted in the State of Mississippi, with the exception of a few anomalies. See generally Stinson v. State, 443 So.2d 869 (Miss.1983) (discussing the history of Mississippi case law regarding multi-count indictments). However, earlier in the same year that Mr. and Mrs. Crawford were brutally killed, this Court decided in Dixon v. State, 465 So.2d 1092 (Miss.1985), that, where multiple crimes had the same elements, the same proof, and arose from the same transaction or occurrence, it was permissible to plead such crimes in a single, multi-count indictment. The next year, 1986, the legislature authorized multi-count indictments when it enacted Mississippi Code Section 99-7-2, and this Court duplicated the language of that statute when it promulgated Rule 7.07 of our Uniform Rules of Circuit and County Court (adopted effective May 1, 1995). The indictment in this case was returned after July 1, 1986, the effective date of Mississippi Code Section 99-7-2, and its multi-count character is controlled by the terms of that statute. Without this statute, a multi-count murder indictment would not have been proper, unless it had fully conformed to the guidelines laid down by this Court in Dixon, 465 So.2d at 1097.
¶ 50. Especially within the context of this case, it is significant that both the legislative and judicial authorization for multi-count indictments in Mississippi state court practice require that the multiple offenses, if they are to be charged in a single grand jury indictment, be “based on the same act or transaction” or that they be “based on (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.” Miss. Code Ann. § 99-7-2(1) (Rev.2007); URCCC 7.07. Inasmuch as the charging document on which the prosecution of Sanders is founded is a multi-count indictment, from the inception of this case in circuit court, the State necessarily was bound to the proposition that the two offenses with which Sanders was charged were “based on the same act or transaction,” or that the two offenses were based on “two or more acts or transactions connected together or constituting parts of a common scheme or plan.” Miss.Code Ann. § 99-7-2(1). If the State had not subscribed to one or the other of those propositions, then it would have been necessary for the prosecution for the Crawfords’ deaths to have been founded upon two separate murder indictments, one for the death of each of the victims.
¶ 51. As the State obviously recognized, a multi-count indictment was appropriate in this case. The tragedy that unfolded at the Crawford home constituted one event at one location during one visit by one person against whom the grand jury returned one indictment. The evidence was to the effect that the perpetrator did not leave the Crawford home until fatal injuries had been inflicted on both victims, that a negligible amount of time transpired between the assaults upon the respective victims, and the same firearm was used to inflict gunshot wounds upon both of them. Though Sanders had, in the early stages of the proceedings, moved to sever the counts, he did not pursue that motion and, in fact, withdrew it. Thus, the prosecution, the defense, and the trial judge all proceeded on the basis that a multi-count indictment was proper, which is to say that it fit the criteria for such pleadings initially *513 laid down by this Court in Dixon, 465 So.2d at 1097, then codified by the legislature in Code Section 99-7-2, and ultimately promulgated by this Court in Rule 7.07 of the Uniform Rules of Circuit and County Court Practice.
¶ 52. Sanders gave timely notice that he would assert an insanity defense, and the State obviously was well prepared to respond to it. Significantly, Sanders did not offer one defense to Count I and another to Count II. Similarly, the State did not offer one set of witnesses to counter the insanity defense for one of the counts and another set of witnesses in opposition to Sanders’s defense of the other. After both sides had finally rested, the Court gave the jury a single set of instructions concerning the insanity defense, not one set of instructions applicable to Count I and another set applicable to Count II.
¶ 53. Yet, despite their instructions to limit their findings to the guilt of the accused, the jurors concerned themselves with the disposition to be made of Sanders after the trial. After the jury had retired and begun its deliberations, it sent to the trial judge the following written questions:
What is the minimum sentence for someone that is found to be insane and a danger to the public?
If the defendant is found not guilty by reason of insanity BUT is a danger to the public[,] will the defendant be allowed to ever walk as a free man on the street?
(Emphasis in original.) The trial court properly declined to answer the jurors’ queries, because, in this case, the disposition to be made of the defendant, whether he was convicted or found not guilty by reason of insanity, was not a matter that was within the province of the jury. But, in what can only be described as an obvious attempt to build into their verdicts a mechanism to assure that Sanders never walked “as a free man” again, the jurors returned irreconcilable, incongruous verdicts. In truth, there is a logical explanation, albeit illegitimate, for what the jury did in rendering its mind-boggling verdicts. The best indicator of the jurors’ intent is found in their proffered but still-pending questions, whereby they sought to learn from the trial court whether there was any possibility that Sanders would ever leave the State’s custody if he were found not guilty by reason of insanity. This jury — which unanimously and unequivocally concluded that Sanders indeed was not guilty by reason of insanity for the death of his grandfather, then ostensibly was led by the same evidence to find that he was guilty as charged concerning the death of his grandmother — sought to manipulate and maneuver Sanders into permanent, lifetime confinement.[45]
¶ 54. This Court does not favor illogical results, and the majority has come to an illogical resolution of this case. Believing, as I do, that the jury’s verdict on Count II of the indictment was contrary to the overwhelming weight of the evidence that Sanders was mentally incapable of distinguishing right from wrong when he inflicted ultimately fatal wounds upon his grandmother, I would reverse his conviction and remand for a new trial.
DICKINSON, P.J., AND CHANDLER, J., JOIN THIS OPINION.

. I also agree with Presiding Justice Carlson’s analysis concerning so-called flight instructions, and join his separate opinion to that extent only.

. The trial judge had no hesitation in joining this enterprise when he ordered Sanders to serve a life sentence before being treated for his mental illness.